675 A.2d 527

Timothy J. CARRION et al.

v.

Robert P. LINZEY.

No. 56, Sept. Term, 1995.

Court of Appeals of Maryland.

April 10, 1996.

Reconsideration Denied May 31, 1996.

268

Bruce R. Parker (Carol L. Nicolette, Goodell, DeVries, Leech & Gray, on brief) Baltimore, MD for Petitioner.

Ronald A. Silkworth (Sandra G. Pike, Ronald A. Silkworth, P.A., on brief) Glen Burnie, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

We are once again asked to construe the statutory presumption of correctness that attaches to the finding of a health claims arbitration panel decision in a subsequent circuit court "judicial review." Maryland Code (1974, 1995 Repl.Vol.), § 3–2A–06(d) of the Courts & Judicial Proceedings Article.[1] Twice previously we have interpreted this provision. In *Attorney General v. Johnson*, 282 Md. 274, 385 A.2d 57 (1978), *appeal dismissed*, 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978), we held that the statutory presumption of correctness did not violate constitutional guarantees of a fair trial. In *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991), we held that the presumption did not shift the ultimate burden of proof of negligence from plaintiff to defendant in the trial of a case where the panel's decision was adverse to the defendant. In the case *sub judice* we look again at the statutory presumption of correctness, this time to explore what a jury should be told about an arbitration panel's membership and vote. Implicit within this inquiry is a more fundamental question about how a party, aggrieved by a decision of an arbitration panel, may attack that decision to overcome the presumption of correctness.

## I.

This appeal arises out of Robert P. Linzey's claim of dental malpractice against Dr. Timothy J. Carrion, Dr. Donald B.

---

1. Hereinafter, unless otherwise indicated, all statutory references are to Md.Code (1974, 1995 Repl.Vol.) of the Courts & Judicial Proceedings Article.

Lurie,[2] and their employer, Donald B. Lurie, D.D.S., P.A. [hereinafter, the appellants will be referred to collectively as "Carrion"]. On May 18, 1987, Carrion performed oral surgery on Linzey. This procedure, called a bilateral sagittal split osteotomy, was intended to correct an "open bite" by moving Linzey's lower jaw into proper alignment with his upper jaw. As part of the procedure, Carrion applied fixation devices to secure the lower jaw during healing. When the fixation devices were removed five weeks later, all signs indicated that the surgery had been successful. Two weeks later, however, a follow-up examination revealed that his lower jaw was not properly healing, allowing the jaw to slip back into its previous position. Carrion then performed a second operation to reposition the lower jaw.

By November of 1987, unsatisfied with Carrion's care, Linzey found a new orthodontist who performed a third surgery to correct Linzey's "open bite."

In May of 1990, Linzey filed a claim of dental malpractice with the Director of the Health Claims Arbitration Office in accordance with the procedures set forth in the Health Claims Arbitration ["HCA"] Act, § 3–2A–01, *et seq.* An arbitration panel was assembled which included John F. Burgan, Esq., panel chair, Dr. Carl J. Oppenheim, a dentist, and Dr. Edward Beach, a Ph.D in Education and the lay member of the panel. On March 5, 1992, at the conclusion of a four-day arbitration hearing, the panel found Carrion liable for malpractice and awarded damages of $167,600.

Counsel for Carrion contacted the arbitration panel members, and on March 21, 1992, procured an affidavit from Dr. Oppenheim who swore that he had dissented from the decision of the panel. Carrion then attempted to make use of the revisory power of the panel chair, granted by § 3–2A–05, to have the panel's award reflect the split decision. Chairperson Burgan by order dated April 17, 1992, declined to modify the

---

2. Claims against Dr. Lurie in his individual capacity were dismissed by the chairperson of the Health Claims Arbitration panel.

award to reflect Dr. Oppenheim's dissenting vote. Carrion then filed an action to reject the arbitration award in the Circuit Court for Baltimore City, where the case was scheduled for a jury trial.

At the beginning of trial Carrion filed a motion *in limine* to clarify what the jury could be told about the arbitration panel's membership and decision. At issue were three general facts:

1. that the panel was composed of a lawyer, a dentist, and a lay person;

2. that the decision of a panel need not be unanimous; and

3. that the dentist member of the panel (Dr. Oppenheim) had dissented.

Carrion would have preferred that all three of these facts be brought to the jury's attention because he hoped that the jury might tend to give less weight to a split decision than to a unanimous decision, and because an impartial dentist's opinion might be very persuasive in convincing the jury that Carrion had not breached the standard of care. Short of the jury being told all three facts, Carrion hoped to avoid a circumstance in which the jury would learn about the panel membership, but not learn that a panel decision need not be unanimous and was not unanimous in this case. Carrion's concern was that the jurors, knowing that *their* decision must be unanimous, would assume that the arbitration panel's decision also had to be unanimous, and knowing the composition of the panel, would conclude that the dentist-panel member had found Carrion liable. Carrion feared that this erroneous conclusion would weigh heavily with the jury as the panel-dentist would be perceived as an expert on dental care offering an impartial opinion that Carrion was liable.

The trial judge ruled that evidence of the panel's membership and vote would be inadmissible at trial and issued an order *in limine* to exclude references to these facts. "When counsel remarked (prophetically) that the jury was going to wonder about the composition of the panel, the trial judge responded, 'And I am going to tell them it is none of their

business.'" *Linzey v. Carrion,* 103 Md.App. 116, 121, 652 A.2d 1154, 1156 (1995).

The case was tried on June 16–23, 1993, and the trial judge described it as "a vigorously contested case, well-tried on both sides...." Late in the proceedings, counsel for both parties read into evidence portions of Linzey's testimony at the arbitration panel hearing. Linzey's counsel, who may have been simply attempting to give the jury some context for the testimony, mentioned that a question from the panel was asked by "Dr. Oppenheim." Counsel did not identify Dr. Oppenheim either as a panel member or as a dentist. After the jury was excused, Carrion's counsel objected, but the trial judge ruled that no irreparable harm had come from the mention of "Dr. Oppenheim."

After they began deliberating, however, the jurors sent out a question: "Who sat on the Arbitration Panel? Were they health professionals and/or lay people?" Although Linzey denies that counsel's mention of "Dr. Oppenheim" caused the jury to ask the question, the trial transcript reveals that the trial judge believed that the mention of "Dr. Oppenheim" led directly to the jury question. While the jury's desire for this information would not be surprising under any circumstances, we do not fault the trial judge's assumption that there was a causal connection between the mention of "Dr. Oppenheim" and the jury's question.

After consulting with counsel, the trial judge re-instructed the jury. This time he told the jury both of the composition of the panel and that its decision had *not* been unanimous:

"The law in Maryland provides that the Health Claims Arbitration Boards consist of one layperson, one lawyer and one health care professional. In this case those were the three categories of persons who sat on the Health Claims Arbitration Board, and that board ruled, as you know, in favor of Mr. Linzey, the Plaintiff, by a two-to-one vote. Unlike the jury system in Court, the verdict of the Health Claims Arbitration Board need not be unanimous."

The jury retired again to consider the instruction. Eventually they returned a verdict nullifying the arbitration panel's decision, and finding Carrion not liable to Linzey for his injuries. Linzey's motion for new trial was denied and he appealed to our intermediate appellate court.

The Court of Special Appeals, in *Linzey v. Carrion, supra,* held that it is always proper for a trial judge to inform the jury about certain statutory facts, including the standard membership of an arbitration panel and that a decision by the panel need not be unanimous. The court held, however, that informing the jury of the split decision of the panel *in a specific case* served to weaken the statutory presumption of correctness impermissibly. As a result, the court reversed the judgment and remanded the case for a new trial. We granted Carrion's petition for a writ of certiorari to review that decision.

## II.

Carrion's argument in this Court is based on two contentions. First, he suggests that unless otherwise instructed, a jury would assume that an arbitration panel decision, like the jury's own decision, must be unanimous. Thus, when an arbitration panel finds in favor of the plaintiff, the jury will infer that the panel's health-care provider, a neutral expert, found the defendant's conduct to be negligent. Second, Carrion argues, the jury will likely place considerable weight on the determination of a neutral expert, and so the jury's erroneous assumptions will be particularly damaging to the defendant. Carrion points out that this string of inferences is most damaging in cases such as his, where the arbitration panel's health-care provider actually dissented from the finding of liability but the jury is not informed of the dissent.

Alternatively, Carrion argues that even if it is not *ordinarily* permissible to tell a jury that an award was not unanimous, the instruction given by the trial court in this case was appropriate to remedy the damage caused by opposing counsel's mention of "Dr. Oppenheim."

Linzey argues that any mention of the panel's vote weakens the legal presumption of correctness of the panel's decision. He stresses that the presumption of correctness advances the important policy goal of reducing medical malpractice litigation by forcing potential malpractice litigants to marshal a complete evidentiary showing in the arbitration hearing, and thereby increasing the number of cases that are resolved at the arbitration hearing stage.

## III.

### A. The History of the Health Claims Arbitration Act.

The history of the medical malpractice insurance crisis that occurred in Maryland in the mid–1970s has been documented extensively elsewhere, so here we merely sketch the history. *See, e.g.,* Harry J. McGuirk & F. Thomas Rafferty, *Medical Malpractice and the Maryland Legislature,* 6 MD.L.FORUM 9 (1976); James Kevin MacAlister & Alfred L. Scanlon, Jr., *Health Claims Arbitration in Maryland: The Experiment Has Failed,* 14 U.BALT.L.REV. 481, 487–90 (1985).

Despite being granted a large rate increase in 1974, St. Paul Fire & Marine Insurance Company ["St. Paul"], then Maryland's largest malpractice insurance carrier, gave notice in 1975 that it intended to withdraw from the market as St. Paul considered it no longer profitable. The State Insurance Commissioner issued an order prohibiting St. Paul's withdrawal and requiring it to continue to provide insurance coverage. The Baltimore City Court affirmed the Insurance Commissioner's order. This Court reversed, holding that the Insurance Commissioner could not require St. Paul to remain in the medical malpractice liability insurance market. Our order, issued immediately after oral argument, did not become valid until several months later when the opinion was issued. The delay between our order and its effective date permitted the General Assembly sufficient time to act to avert a crisis. *St. Paul Fire & Marine Ins. Co. v. Insurance Comm'r,* 275 Md. 130, 339 A.2d 291 (1975).

The General Assembly responded by creating the Medical Mutual Liability Society of Maryland. Ch. 544 of the Acts of 1975 *codified as* Md.Code (1957, 1972 Repl.Vol., 1977 Cum. Supp.), Art. 48A, §§ 548–556. This non-profit insurance company quickly became the primary insurer of Maryland's physicians. *Attorney General v. Johnson*, 282 Md. 274, 280–81, 385 A.2d 57, 61 (1978). The Legislature also shortened the statute of limitations for instituting medical malpractice claims, ch. 545 of the Acts of 1975, *codified as* § 5–109, and passed a law to promote peer review for physicians, ch. 423 of the Acts of 1975, *codified as* Md.Code (1981, 1994 Repl.Vol., 1995 Cum. Supp.), § 14–501 *et seq.* of the Health Occupations Article.

Most importantly, the General Assembly created a committee to study methods of reforming the manner in which the legal system responds to claims of medical malpractice. The Medical Malpractice Study Committee was appointed on July 23, 1975, and on January 6, 1976, issued its report.

The Committee proposed adoption of a mandatory medical malpractice arbitration system in Maryland, contending that such a system would improve on the traditional tort system in several ways. First, effective arbitration would discourage litigation of non-meritorious claims, because, in part, evidentiary weaknesses would become apparent during the arbitration stage. Second, arbitration would encourage the early settlement of meritorious claims, because a panel finding of liability would encourage health care professionals and their insurance carriers to settle. Third, the Committee believed that the expertise of the panel members, as opposed to jurors, would lead to accurate decisions in more cases as well as reasonable and predictable damage awards. Accompanying the text of the committee report was proposed legislation, which ultimately was adopted as ch. 235 of the Acts of 1976, and codified as § 3–2A–01, *et seq.*

## B. Features of the Health Claims Arbitration Act.

In *Attorney General v. Johnson*, 282 Md. 274, 385 A.2d 57 (1978), we reviewed the salient features of the Health Claims

Arbitration Act. We emphasized that the primary feature of the new system was to "require the submission of certain [medical malpractice] claims to an arbitration panel for initial ascertainment of liability and damages before resort may be had to a court of law for final determination," i.e., mandatory arbitration.[3] *Id.* at 277, 385 A.2d at 59. We went on to discuss the specific features of the system:

"All malpractice claims against health care providers seeking damages of more than $5,000 are subject to the provisions of the Act, and must be initially filed, as must the responses to them, with the Health Claims Arbitration Office, created by the statute 'as a unit in the Executive Department.' The office, acting through its director, refers all issues raised to a three-member arbitration panel, chosen at random from lists of qualified persons prepared and maintained by the director; the panel for each claim is to be composed of an attorney, a health care provider, and a member of the general public. The arbitration panel determines whether the health care provider is liable to the claimant and if so the extent of the damages, and incorporates in its award an assessment of costs, including arbitrators' fees; if no party rejects the award, it becomes final and binding, is filed by the director with the appropriate circuit court, and when confirmed by that court constitutes a final judgment. Neither party, however, is in any way bound to accept the award; it may be rejected for any reason within ninety days. If a party desires to contest the decision of the panel, he must file an action in the appropriate court during the ninety-day period to nullify the award, and jury trial may be elected by either party. Any contention that an award should be vacated on the ground of corruption, fraud, partiality or the like is to be decided by the court prior to trial. Unless the award is thus vacated, it is admissible as evidence at the trial and presumed to be

---

3. During its 1995 session, the General Assembly adopted a major change in the Health Claims Arbitration Act, by permitting waiver of the entire arbitration system at the discretion of either party. Ch. 582 of the acts of 1995, *codified as* § 3–2A–06B.

correct, with the burden of proving the contrary falling on the party rejecting it; should the award be vacated, 'trial of the case shall proceed as if there had been no award.' In addition, attorneys' fees are subjected to the approval respectively of the arbitration panel and the court."

*Id.* at 279–80, 385 A.2d at 60–61 (citations and footnotes omitted). *See also* James Kevin MacAlister & Alfred L. Scanlon, Jr., *Health Claims Arbitration in Maryland: The Experiment Has Failed*, 14 U.BALT.L.REV. 481, 493–97 (1985). Of particular significance to the case *sub judice* is the statutory presumption of correctness that attaches to the decision of an arbitration panel in a subsequent circuit court judicial review.

## C.   The Presumption of Correctness.

We begin with an analysis of the statutory presumption of correctness for two related reasons. First, the admissibility of the arbitration panel's membership and voting is, at its center, a question concerning how a party that lost at the arbitration stage may attack the presumption of correctness. Determining the "strength" of that presumption is thus vital to an understanding of the methods that may be employed to attack the presumption. Second, there are several theories regarding the effect of presumptions generally. Each of these theories carries with it correlative principles about instructing a jury about the effect of the presumption. For us to determine what a jury can be told about the panel membership and vote, we must understand the theories of presumptions that may apply.

Although many states have adopted systems of arbitration for medical malpractice claims, the statutory presumption of correctness given a panel decision in subsequent litigation is a feature unique to Maryland's system. Comment, *The Constitutionality of Medical Malpractice Mediation Panels: A Maryland Perspective*, 9 U.BALT.L.REV. 75, 76 n. 7 (1979). In the arbitration schemes adopted by other states, the panel deci-

sion may or may not even be admissible.[4]   Our sister states can thus provide no guidance.

Instead we will make a three part inquiry, looking at presumptions under general Maryland law, examining the legislative history of the presumption of correctness contained in this statute, and by reviewing our decisions regarding this presumption.

### 1.  *Presumptions Generally.*

Effective July 1, 1994, this Court for the first time adopted an evidence code for the courts of Maryland.   Among the rules adopted was Rule 5–301(a), which provides:

> "**Effect [of Presumptions in Civil Actions].**—Unless otherwise provided by statute or by these rules, in all civil actions a presumption imposes on the party against whom it is directed the burden of producing evidence to rebut the presumption.   If that party introduces evidence tending to disprove the presumed fact, the presumption will retain the effect of creating a question to be decided by the trier of fact unless the court concludes that such evidence is legally insufficient or is so conclusive that it rebuts the presumption as a matter of law."

The comments of the Court of Appeals Standing Committee on Practice and Procedure indicate that this rule is intended to codify the approach of this Court in *Grier v. Rosenberg,* 213 Md. 248, 131 A.2d 737 (1957), and rejects both the "Thayer–Wigmore bursting bubble" approach found in Fed.R.Evid. 301 and the "Morgan-type" presumption of Unif.R.Evid. 301 (1986).   Under the "bursting bubble" theory of presumptions,

> "a presumption operates in favor of a party who has the burden of proof by shifting to the other party the duty of going forward with the evidence on the issue.   In effect, this

---

**4.**  For two good overviews of the variety of attempts made by state legislatures to divert medical malpractice claims from the traditional tort system, *see* Note, *Medical Malpractice Arbitration: A Comparative Analysis,* 62 VA.L.REV. 1285 (1976); Kenneth S. Abraham, *Medical Malpractice Reform: A Preliminary Analysis,* 36 MD.L.REV. 489 (1977).

means that the party relying on the presumption can get past a motion for a directed verdict made at the close of his case without any direct proof of the presumed fact, and may succeed with respect to that issue if the other party does not come forward with evidence.... Once the other party produces evidence on the issue sufficient to support a finding contrary to the presumed fact, the bubble is burst and the presumption no longer exists in the case."

Note, *Presumptions in Civil Cases: Procedural Effects Under Maryland Law in State and Federal Forums,* 5 U.Balt.L.Rev. 301, 305–06 (1976) (footnotes omitted). In a "bursting bubble" presumption, the jury is never told about the presumption. *Id.* at 306.

Alternatively, a Morgan-type presumption shifts the burden of persuasion on a given issue. Graham C. Lilly, *An Introduction to the Law of Evidence* 54 (1978) (citing Edmund Morgan, *Some Problems of Proof* 74–81 (1956)).[5] In a Morgan-type presumption there is no need to inform the jury of the presumption, only of the allocations of the burden of persuasion.

Instead of either of these approaches, we adopted Md.Rule 5–301. Although Md.Rule 5–301 was not itself in effect when the instant case was tried in June of 1993, it merely codified the existing common law of Maryland, and so the same principle applied. As Professor Alan Hornstein of the University of Maryland, School of Law explains it:

"Under Rule 5–301 [and the common law rule that preceded the rule's adoption], presumptions do not affect the burden of persuasion. A presumption merely satisfies the burden of production on the fact presumed and, in the absence of rebutting evidence, may satisfy the burden of persuasion. If there is rebutting evidence, the presumption retains only

---

**5.** The Morgan-type presumption is embodied in the approach adopted by the Unif.R.Evid. 301: "a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

enough vitality to create a jury question on the issue, and
the jury is instructed on the presumption."

Alan D. Hornstein, *The New Maryland Rules of Evidence:
Survey, Analysis and Critique*, 54 MD.L.REV. 1032, 1049
(1995). Maryland Rule 5–301, therefore, describes the effect
that a presumption should have unless a specific presumption
is given more or less weight by rule, statute, or judicial
interpretation. Alone among the three theoretical models, the
Md.Rule 5–301 presumption requires informing the jury of the
existence of the presumption. As our predecessors said in
*Grier v. Rosenberg*, 213 Md. 248, 131 A.2d 737 (1957), "if the
instruction [on the existence of a presumption] be not granted,
how is the jury to know of the presumption?" *Id.* at 253, 131
A.2d at 739. *See also* Note, *Presumptions in Civil Cases:
Procedural Effects Under Maryland Law in State and Federal Forums*, 5 U.BALT.L.REV. 301, 310–11 (1976).

>   2. *Legislative History of Presumption of Correctness in
>   the Health Claims Arbitration Act.*

The Medical Malpractice Study Committee's proposal to
adopt mandatory medical malpractice arbitration included a
description of the following feature of the proposed system:

> "5. Any party shall have the right to reject an award and
> file an action in court, with the right of *de novo* trial before
> judge or jury. However, the award is admissible in evi-
> dence and given a presumption of correctness, in the same
> manner as Workmen's Compensation Commission awards.[6]
> Moreover, if the rejecting party (appellant) does not receive
> a verdict more favorable to him than the award he rejected,
> he will pay the costs of the judicial proceedings."

Accompanying the text of the report is proposed legislation,
which became the genesis of the HCA Act, *adopted as* ch. 235
of the Acts of 1976. Each version, from the Committee's

---

**6.** In *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991), we made
clear that the analogy between the presumption of correctness in an
appeal from the Workers' Compensation Commission and the presump-
tion of correctness in a judicial review of a decision of a Health Claims
Arbitration panel is flawed. *Id.* at 731–33, 594 A.2d at 1159–60.

initial proposal to that enacted in 1976 contained similar language:

"Unless vacated by the court pursuant to subsection (c), the arbitration award is admissible as evidence in the judicial proceeding. The award shall be presumed to be correct, and the burden is on the party rejecting it to prove that it is not correct."

Ch. 235 of the Acts of 1976.

With the single exception of the addition of the adjective "unmodified" before the word "arbitration" by ch. 596 of the Acts of 1987, the provision has remained unchanged since adoption. Section 3–2A–06(d). Similar language is found in the Md.Rules:

"Unless the arbitration award is vacated pursuant to Code, § 3–2A–06(c), Courts Article, it is admissible as evidence and the burden of proof is on the party rejecting the award to show that it is not correct."

Md.Rule BY5.

While the Medical Malpractice Study Committee was doing its research in the fall of 1975, the Maryland State Bar Association ["MSBA"] apparently became concerned about the proposals being discussed. In August of 1975, MSBA president, Wilbur D. Preston, Jr., Esq. appointed a "Special Committee to Study Problems Related to Medical Malpractice in Maryland." The MSBA Special Committee's report was adopted in a series of resolutions by the Board of Governors of the MSBA. Those resolutions proposed a non-binding, screening panel as well as a lesser weight to be assigned the arbitrators' decision in a subsequent trial:

"5. The [arbitration] panel would issue a brief written decision as to liability and damages, if any, stating also the facts upon which its determinations are based. The panel's written decision *and any dissenting opinion* would be admissible at any subsequent trial, if in conformity with applicable law and not arbitrary or capricious. Panel members themselves would not be subject to subsequent subpoena. In the event that the decision of the screening [arbitra-

tion] panel is in favor of the plaintiff, the defendant could offer to settle the dispute for the amount of damages awarded by the panel. If the plaintiff rejects this offer, then the decision of the panel ... should not be admissible over that defendant's objection at a subsequent trial of the case." (Emphasis added).

The proposals of the MSBA special committee were explained to "three standing Committees of the Maryland General Assembly," by Kenneth S. Abraham, Esq., Vice Chairman of the Special Committee, and an Assistant Professor of Law at the University of Maryland.[7]

Looking back, we can say with some assurance that the General Assembly was aware of the broad range of legislative choices it faced in creating the Health Claims Arbitration system. Despite the MSBA's recommendation that a dissenting opinion by a panel member be admissible at the subsequent trial, the General Assembly chose to remain silent on the issue.[8] The Legislature also intentionally created a sys-

---

7. It is interesting to note that Professor Abraham, in a law review article published approximately one year after the adoption of the Health Claims Arbitration Act, discussing the appeal provisions of various medical malpractice arbitration systems, did not mention Maryland's presumption of correctness of the panel decision. Kenneth S. Abraham, *Medical Malpractice Reform: A Preliminary Analysis*, 36 MD.L.REV. 489, 515 (1977).

8. The Health Claims Arbitration Act does not refer to a dissenting vote at all. The general arbitration statute, Md.Code (1974, 1995 Repl.Vol.), § 3–201 *et seq.*, of the Courts and Judicial Proceedings Article states that "the majority of the arbitrators may determine any question and render a final verdict." Section 3–215 of the Courts and Judicial Proceedings Article. The regulations promulgated by the Health Claims Arbitration Office governing the form that arbitration awards must take seem to exclude the possibility of a dissenting opinion by a panel member:

"E. Form of Award.
(1) Within 5 days after the close of the hearing, the arbitration panel shall submit to the Director a written award that concisely states the following information:
(a) With respect to each health care provider, that he was liable or that he was not liable;
(b) If applicable, the amount of damages calculated under § C, above; [and]

tem wherein the panel decision was admissible as evidence and presumed correct at the subsequent trial, contrary to the stated wishes of the MSBA.

■ The General Assembly, by each of its actions, chose that option that made success on judicial review more difficult for the party that lost at the arbitration panel. From these legislative choices, we infer the General Assembly's strong preference to dispose of a majority of medical malpractice cases in the arbitration system and minimize the number of cases brought to trial in the traditional tort system.[9]

3. *Judicial Interpretation of the Presumption of Correctness in the Health Care Arbitration Act.*

Our experience in reviewing cases arising under the Health Claims Arbitration Act has been similar to Ulysses' journey through the Strait of Messina: an attempt to avoid on one side the Scylla of the constitutional infirmity of not permitting a trial by jury, and on the other, the Charybdis of the expense and redundancy of an arbitration system whose decisions are *uniformly* challenged in court. A careful review of our deci-

---

(c) The arbitration costs and any apportionment made under § D, above[.]"
COMAR 01.03.01.12(E). While it would be interesting and useful to know, the record does not reflect if arbitration awards frequently reflect a dissenting vote as Carrion's counsel suggested in oral argument.

9. In 1983, a Medical Malpractice Task Force, chaired by the late State Senator Harry J. McGuirk of Baltimore City, studied the Health Claims Arbitration system. Despite several recommendations to eliminate the presumption of correctness of the arbitration panel decision, the Task Force refused to recommend the repeal of the presumption. Minutes of January 10, 1983, at 3. For testimony urging elimination of the presumption, *see* testimony of Barry J. Nace, Esq., minutes of October 14, 1982, at 4; testimony of Albert D. Brault, Esq., minutes of November 23, 1982, at 4–5; and testimony of Dr. Manning W. Alden, President of the Medical Mutual Liability Insurance Society of Maryland, minutes of November 23, 1982, at 6.

sions regarding the presumption of correctness reveals the compromise we have struck between these two evils.[10]

This Court first reviewed the presumption of correctness in *Attorney General v. Johnson*, 282 Md. 274, 385 A.2d 57 (1978). The plaintiffs in that case, seeking to avoid mandatory arbitration, challenged the HCA Act on multiple constitutional grounds, including separation of powers, due process, and equal protection. Relevant here was plaintiff's assertion that the presumption of correctness "virtually deprived the jury of its constitutional function." *Id.* at 292, 385 A.2d at 67. Johnson argued that a jury would be so influenced by the decision of the arbitration panel that it would abdicate its essential constitutional role as finder of fact and simply defer to the panel.

Not sharing Johnson's skepticism about Maryland juries, we disagreed. We held that the presumption of correctness was a mere rule of evidence, acting to create a rebuttable presumption. "It cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury." *Id.* at 294–95, 385 A.2d at 69 (*quoting Meeker v. Lehigh Valley R.R.*, 236 U.S. 412, 430, 35 S.Ct. 328, 335, 59 L.Ed. 644, 657 (1915)). We also analogized the presumption to that employed in the workers' compensation setting and in the provisions of the Maryland Constitution

---

**10.** Judge Solomon Liss explained this Homeric allusion in *Conner v. State*, 34 Md.App. 124, 366 A.2d 385 (1976):

"One of the hazards of Ulysses' journey was to traverse the narrow channel between Scylla, the six-headed monster who sat on a rock, and Charybdis, another monster who by sucking in water created a whirlpool. In avoiding the whirlpool Ulysses passed too close to Scylla who seized six of his sailors and ate them.

Jason and his Argonauts had a somewhat more successful adventure with the clashing rocks which guarded the entrance to the Bosporus Straits. By following the advice of Phineas to send a dove between the rocks first he was able to traverse the passageway without injury to his ship or his sailors. The dove lost a few tail feathers and his dignity."

*Id.* at 132 n. 7, 366 A.2d at 390 n. 7.

requiring just compensation for public takings. *Id.* at 293–96, 385 A.2d at 68–70.[11]

In *Su v. Weaver*, 313 Md. 370, 545 A.2d 692 (1988), an arbitration panel found liability on the part of the defendant-physician with respect to a claim of negligence during the post-operative period, but not as to the other claims of negligence in diagnosis and surgery. The *Su* Court opined that a failure to tell the jury that the arbitration panel had found for the defendant on two counts might have led the jury to presume erroneously that the panel had found for the plaintiff on all counts. To avoid this confusion, and the potentially unfair advantage resulting from it, we held that "when the issues of liability are sufficiently separate and distinct, the decision of the arbitrators as to each of those issues should be set forth in the award, and in the event of a judicial proceeding following arbitration, these decisions should be made known to the jury." *Id.* at 382, 545 A.2d at 698. Carrion argues that *Su* stands for the principle that if a jury might be mislead about the decision of an arbitration panel, a trial judge should take appropriate steps to dispel the confusion.

We most recently took up the issue of the presumption of correctness in *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991). The Court of Special Appeals had held, in *Hahn v. Suburban Hospital Ass'n*, 54 Md.App. 685, 461 A.2d 7 (1983), that the presumption of correctness under the Health Claims Arbitration Act served to shift the common law burden of proof from plaintiff to defendant. Under that reading, a defendant who lost before the arbitration panel would have the burden of disproving his alleged negligence at the circuit court

---

**11.** The analogy to workers' compensation law would later prove to have been an unfortunate one. In *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991), we made clear that the differences between this statute and the workers' compensation were greater than the similarities between the two. While the presumption of correctness in workers' compensation law serves to shift the burden of persuasion (and even the order of presentation) in a workers' compensation case, no such shift of the common law burden of persuasion occurs in medical malpractice law.

trial. Our decision in *Newell* explicitly overruled *Hahn* and made clear that the presumption of correctness does not shift the common law burden of proof. As we explained the permutations in *Newell:*

> "Shifting the common law burden of proof based on the health claims panel award would penalize an unsuccessful health care provider far more than an unsuccessful claimant. If either the claimant or health care provider is unsuccessful at arbitration, the award is admissible and will have evidentiary impact on the trier of fact. If the claimant is unsuccessful at arbitration, the burden of proof was on the claimant before arbitration and will be on the claimant after arbitration. Thus, as far as the burden of proof is concerned, the unsuccessful claimant is in the same position as if arbitration had not occurred. On the other hand, if the health care provider is unsuccessful at arbitration, in addition to the evidentiary effect of the adverse award, the health care provider would be further penalized by a shifting of the usual burden of proof as the result of the arbitration award."

*Newell,* 323 Md. at 733, 594 A.2d at 1160. *Newell* also overruled that part of *Johnson* which relied on an analogy to the workers' compensation system to establish a shift in the burden of proof.

Finally, in *Crawford v. Leahy,* 326 Md. 160, 604 A.2d 73 (1992), we rejected an argument that an injured party could reject only the damages portion of an arbitration panel's award. Instead, we held that a party must reject all or none of the arbitration panel's award. Although we did not base this decision on the presumption of correctness, we did make clear that the purpose of the presumption was "to deter rejection of panel decisions." *Id.* at 175, 604 A.2d at 80. Because permitting a party to appeal the quantum of damages only, without putting at risk the favorable determination on liability, would have the opposite effect-encouraging appeals-we rejected it. *Id.*

4. *Conclusions about the Presumption of Correctness in § 3–2A–06(d).*

We shall hold today that the effect of the presumption of correctness found in § 3–2A–06(d) is exactly the effect described by Md.Rule 5–301. At the subsequent trial *de novo,* the party challenging the decision of the arbitration panel has the burden of producing evidence tending to disprove the panel's decision. Once this burden of production is met, the presumption retains enough vitality so that, without any other evidence, the party that prevailed at the panel can get to the jury. As we said in *Newell v. Richards,* 323 Md. 717, 594 A.2d 1152 (1991), the burden of persuasion never shifts in a medical malpractice case, and as at common law, the plaintiff must carry this burden.

Were we to adopt instead the "bursting bubble" theory, we would fail to give full effect to the Legislature's intention to maximize the number of cases resolved in the arbitration stage, because production of a sufficient quantum of evidence would destroy the presumption, and because the jury would not be informed of the presumption. Alternatively, adoption of the Morgan-type presumption would likely violate the defeated party's right to trial, and certainly require us to overrule *Newell v. Richards,* 323 Md. 717, 594 A.2d 1152 (1991).

Moreover, were we to adopt another theory of presumptions, we would be, in effect, changing *sub silentio* the appropriate jury instruction. In *Newell v. Richards,* 323 Md. 717, 734, 594 A.2d 1152, 1160–61 (1991), we approved a jury instruction informing the jury of the presumption of correctness. As discussed previously, under neither the "bursting bubble" nor the Morgan-type presumption is the jury notified of the existence of a presumption. Only if the presumption of correctness is given the weight prescribed in Md.Rule 5–301 is the jury informed of the presumption. Thus, *Newell* foreshadowed the adoption of this standard.

For all of these reasons, the statutory presumption of correctness of § 3–2A–06(d) is to be given the weight and

force described by Md.Rule 5–301 and *Grier v. Rosenberg,* 213 Md. 248, 131 A.2d 737 (1956).

## IV.

We next turn to the issue of the ethical considerations involved in Carrion's counsel obtaining Dr. Oppenheim's affidavit. The Health Claims Arbitration Office regulations provide:

"G.   Contact with Panel Candidates and Members.

(1) Except as provided in § G(2), below, a party or his counsel may not communicate directly with an arbitration panel candidate or member concerning the claim.

(2) A party or his counsel shall communicate with a member of the arbitration panel only by either of the following means:

(a) Written communication submitted to the Chairman of the panel and served on the other parties or their counsel;

(b) Oral communication with the panel member in the presence of the other parties or their counsel."

COMAR 01.03.01.07(G). The Maryland Rules of Professional Conduct provide that a lawyer "shall not: ... communicate *ex parte* about an adversary proceeding with the judge or other official before whom the proceeding is pending, except as permitted by law; . . . ." Rule 3.5(a)(7).

This case was tried before the arbitration panel for four days concluding on March 5, 1992. The award of the panel was signed by the chairperson on that same day. The affidavit from Dr. Oppenheim is dated March 24, 1992, nineteen (19) days after the issuance of the award.

Linzey alleges that Carrion's discussion with Dr. Oppenheim, which occurred within the 30–day period during which a party may ask the arbitration panel to modify or correct an award, constituted an ex parte communication in violation of both the regulations of the Health Claims Arbitration Office and the Maryland Rules of Professional Conduct.

We discern nothing in counsel's activities that violated the quoted regulations or the Rule of Professional Conduct set forth above. After an arbitration panel makes its award, there are no remaining tasks for the health care provider or layperson panel members. Only the panel chair has duties during the period subsequent to the award:

"(h) *Application for modification or correction; request for reduction of damages.*—A party may apply to the arbitration panel to modify or correct an award as to liability, damages, or costs in accordance with § 3–222 of this article. . . .

The *panel chairman* shall receive such evidence in support and opposition to a request for reduction, including evidence of the cost to obtain such payment, reimbursement, or indemnity. After hearing the evidence in support and opposition to the request, the *panel chairman* may modify the award if satisfied that modification is supported by the evidence."

§ 3–2A–05(h) (emphasis added).[12] Therefore, counsel's contact with Dr. Oppenheim came subsequent to the pendency of the arbitration, at least as it concerned Dr. Oppenheim, and thus violates neither COMAR 01.03.01.07(G), nor Maryland Rules of Professional Conduct, Rule 3.5(a)(7).[13]

---

**12.** Language found in the regulations of the Health Claims Arbitration Office, COMAR 01.03.01.13, that suggests, contrary to the statute, that modification is a joint task of the entire arbitration panel ("An arbitration panel may modify its award . . .") is invalid and of no effect. *Fogle v. H & G Restaurant, Inc.*, 337 Md. 441, 463–64, 654 A.2d 449, 460 (1995).

**13.** We also reject Linzey's argument that there is no competent evidence to support Carrion's assertion that this was a 2–1 decision by the arbitration panel. The affidavit prepared by Dr. Oppenheim is a clear statement given under oath that he dissented from the award. Linzey has offered no suggestion that the affidavit is not valid or that its contents are untrue. Furthermore, it was attached as an appendix to Carrion's motion *in limine*, and therefore properly before the trial judge. Consequently, the statement to the jury that the vote of the arbitration panel was 2–1 was not erroneous on the basis of a lack of factual predicate.

V.

We turn now to the heart of this case, the jury instructions. We must determine if the instructions given were consistent with our understanding of the statutory scheme of the Health Claims Arbitration Act generally, and the presumption of correctness specifically. As discussed above, the trial judge initially refused to instruct the jury about either the arbitration panel's membership or its split decision, telling them only of the presumption of correctness in accordance with the *Maryland Civil Pattern Jury Instructions*, § 27:2 (2d ed. 1984).[14] Later, however, in response to the jury's inquiry about the membership of the panel, he reinstructed the jury. We repeat that instruction:

> "The law in Maryland provides that the Health Claims Arbitration Boards consist of one layperson, one lawyer and one health care professional. In this case those were the three categories of persons who sat on the Health Claims Arbitration Board, and that board ruled, as you know, in favor of Mr. Linzey, the Plaintiff, by a two-to-one vote. Unlike the jury system in Court, the verdict of the Health Claims Arbitration Board need not be unanimous."

The Court of Special Appeals held that this instruction constituted reversible error. Although we shall ultimately reverse that decision based on the specific facts in this case, the framework of the court's analysis is correct and we adopt it. In evaluating the trial judge's instructions, the Court of Special Appeals drew a distinction between jury instructions based on information gleaned from the enabling statute and those instructions based on the particular facts of the specific case. The court would approve of instructing the jury on three facts derived from the statute:

1. that the health claims arbitration panel was composed of

---

**14.** We specifically approved this instruction in *Newell v. Richards*, 323 Md. 717, 734, 594 A.2d 1152, 1160–61 (1991).

a lawyer, a health care provider[15] and a lay person (§ 3–2A–03(c));

2. that the decision of a majority of an arbitration panel is the decision of the panel, *i.e.*, that a panel's decision need not be unanimous (§ 3–215); and

3. that the decision of the arbitration panel is entitled to a presumption of correctness (§ 3–2A–06(d)).

We agree with the Court of Special Appeals that these facts are appropriate information to provide the jury. This information provides the context for the jury to understand and weigh the panel's decision as they are required to do by the statute. As the Court of Special Appeals stated, these "are matters established by law, and there ought to be no secret about them." *Linzey v. Carrion*, 103 Md.App. at 125, 652 A.2d at 1158. Giving a jury instruction which explains the presumption of correctness is consonant with Md.Rule 5–301. Moreover, the use of these instructions, by explaining the arbitration process and making the jury more familiar with the panel's expertise, will tend to enforce the presumption of correctness. Instructing the jury in this manner will also avoid the vice that Carrion initially feared, that a jury would believe that the panel's vote must be unanimous, and thus be led to conclude that the panel had voted unanimously, when, in fact, a member had dissented. We encourage trial judges to add these facts to their standard jury instructions.

■ Unfortunately, however, the trial judge's instructions went a step further. He told the jury that *in this specific case* the panel vote had been two-to-one. The Court of Special Appeals held that this information was improperly given to the jury as it undermined the statutory presumption of correctness. *Id.* at 125–126, 652 A.2d at 1158–59.

■ Under most circumstances we would agree. A jury normally has no need for this case-specific information. When

---

**15.** It is also permissible to indicate the health care specialty of a panel member, where, as here, that panel member was selected because of a specialty similar or identical to that of the defendant.

Carrion's counsel states that it is "his job" to attack the presumption of correctness of the arbitration panel decision, we agree to the extent that counsel seeking to reverse an adverse panel decision should attack the *substance* of that decision. The attack may involve an infinite variety of challenges both to the evidence offered below and to the panel's interpretation of that evidence. We disagree with Carrion, however, that the attack should include a dissection of the panel vote itself. Challenging *collateral* aspects of the arbitration decision, however, should generally be off limits for jury argument or instruction, because if the decision is procedurally valid it must be presumed correct. Examples of such collateral challenges would include argument that a decision was not unanimous; that the health care provider/panel member was not of a sufficiently similar specialty to the defendant; or that the health care provider/panel member, by virtue of his or her profession, was biased against the plaintiff.[16] Such collateral challenges are almost never appropriate.

On the facts of this case, however, where the plaintiff violated the trial judge's order *in limine* banning the mention of the panel's membership, we will not create an absolute rule that to instruct the jury about a collateral matter is fatally erroneous. While we have made it clear that we would instruct the jury differently, the trial judge's obvious intent in his order *in limine* was, quite properly, to strike a delicate balance between Linzey's right to the presumption of correctness and Carrion's right to try his case. When Linzey's counsel mentioned "Dr. Oppenheim" in direct violation of the judge's order, that balance was tilted precariously.

---

**16.** Fears have been expressed that health care providers will be predisposed to oppose damage awards because of the effect such awards may have on their own insurance rates, particularly given the fact that 90% of Maryland physicians are insured by the same insurer, the Medical Mutual Liability Insurance Society of Maryland. Comment, *The Constitutionality of Medical Malpractice Mediation Panels: A Maryland Perspective,* 9 U.Balt.L.Rev. 75, 79 n. 29 (1979). Our discussion of such concerns should not be taken as an expression that we share them.

Although Linzey emphasizes that each of the panel members could correctly be referred to as "doctor," and that his reference to "Dr. Oppenheim" did not necessarily imply a medical doctor or dentist, the trial judge concluded that the comment led the jury to discover that the panel included a health care professional. Allowing this information to stand, without more, would have permitted the jury to infer erroneously that the panel's health care provider member had found Carrion liable for malpractice.

In *Su v. Weaver, infra*, we held that a trial court should take steps to avoid a jury reaching a misunderstanding about the panel's decision. In the instant case, the trial judge took active steps to avoid the jury's possible misunderstanding and to restore the balance initially upset by Linzey's counsel. In this spirit, he instructed the jury about the split decision of the panel. We hold, therefore, that under the circumstances of the instant case, the trial judge did not abuse the discretion vested in him to choose the cure for the prejudicial statement made by Linzey's counsel in violation of the order *in limine*. *DeMay v. Carper*, 247 Md. 535, 540, 233 A.2d 765, 768 (1964); *Drug Fair of Maryland, Inc. v. Smith*, 263 Md. 341, 353–54, 283 A.2d 392, 399 (1971).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS TO BE PAID BY THE RESPONDENT.*