# EDWARD S. MEHLMAN ET AL. *v.* CHARLOTTE W. POWELL ET AL.

[No. 39, September Term, 1977.]

*Decided October 28, 1977.*

270

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and DAVID T. MASON, Associate Judge of the Court of Special Appeals, specially assigned.

*James P. Salmon,* with whom were *Sasscer, Clagett, Channing & Bucher* on the brief, for appellant Edward S. Mehlman. *David A. Levin,* with whom were *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellant Holy Cross Hospital of Silver Spring, Inc. *Roy L. Mason,* with whom were *William A. Ehrmantraut* and *Donahue & Ehrmantraut* on the brief, for appellant Ruben C. Cosca.

*Carl Harrison Lehmann* for appellee Charlotte W. Powell, with whom were *Alan R. Siciliano* and *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellee Holy Cross Hospital of Silver Spring, Inc.

ELDRIDGE, J., delivered the opinion of the Court.

This is a medical malpractice action which arose out of the following circumstances. Beginning in December 1973, Mr.

William Powell experienced shortness of breath and other discomfort which led him, in March 1974, to consult his personal physician. Mr. Powell's physician, after administering a variety of tests, referred Mr. Powell to Dr. Edward Mehlman, a specialist in internal medicine. On April 5 and again on April 15, 1974, Mr. Powell visited Dr. Mehlman's office and further tests were performed. The results of these tests were inconclusive. It was alleged in the trial court proceedings that, given the symptoms displayed by Mr. Powell, standard medical procedure would have included the administration of a perfusion lung scan. Dr. Mehlman did not administer this procedure. It was further contended that the perfusion lung scan would have revealed that Mr. Powell was suffering from pulmonary embolic disease, and that this disease could have been successfully treated had the correct diagnosis been made.

On May 28, 1974, Mr. Powell was unable to get out of bed. His wife telephoned Dr. Mehlman's office but was unable to reach him, and the decision was made to take Mr. Powell to Holy Cross Hosptital. He was received in the Holy Cross Hospital emergency room by Dr. Ruben Cosca. Dr. Cosca ordered an electrocardiogram, a physicial examination, x-rays and other tests, and consequently made an initial diagnosis of pneumonitis. It was undisputed at trial that the electrocardiogram revealed gross abnormalities, and that Dr. Cosca's reading of the electrocardiogram was erroneous. It was claimed that, on the basis of the electrocardiogram and other available evidence, Dr. Cosca should have known that Mr. Powell was in imminent danger of dying from heart failure due to pulmonary embolism.

As a result of the diagnosis of pneumonitis, Mr. Powell was released from the Hospital and returned to his home. Mr. Powell died on the morning of May 30, 1974, without receiving further medical attention. An autopsy revealed pulmonary embolism to have been the cause of his death.

The widow and minor children of William Powell brought this action in the Circuit Court for Montgomery County against, *inter alia*, Dr. Edward Mehlman, Dr. Ruben Cosca and Holy Cross Hospital, claiming that the defendants had

negligently caused the death of William Powell. A jury returned a verdict in favor of the plaintiffs and against the above-named defendants for $221,000, and judgments for this amount were entered. A judgment was also entered in favor of the Hospital and against Dr. Cosca, on the Hospital's cross-claim against Dr. Cosca for indemnity. The defendants took appeals from these judgments to the Court of Special Appeals, and, prior to any decision in the Court of Special Appeals, this Court issued a writ of certiorari.

## (1)

In the trial court, the plaintiffs argued that Dr. Cosca, the emergency room physician, was either actually or apparently an employee of the Hospital, and that, consequently, the Hospital was vicariously liable for the negligent acts of Dr. Cosca.

The Hospital, at the close of evidence, moved for a directed verdict on the ground that the plaintiffs had failed to establish any master-servant relationship between Dr. Cosca and the Hospital, and the Hospital now claims that the trial court's denial of this motion was in error.

The Hospital argues that Dr. Cosca, with other physicians, operated the Hospital emergency room as independent contractors, and that the Hospital and the Hospital emergency room were separate entities. Therefore, the argument continues, there was no actual master-servant relationship between Dr. Cosca and the Hospital, and the Hospital cannot be liable for Dr. Cosca's negligence. We note, however, that the record shows that the Hospital subjects the emergency room to a degree of control through its regulations. For example, one regulation provides that an emergency room physician does not have the authority to admit patients to the Hospital. This must be done by the patient's private physician. The record also shows that all billing for emergency room services is done by the Hospital, not the emergency room physicians.

Nevertheless, we will assume arguendo that no actual master-servant relationship between Dr. Cosca and the

Hospital was established. We still believe that the trial court was correct in its denial of the Hospital's motion for a directed verdict.

In *B. P. Oil Corp. v. Mabe,* 279 Md. 632, 643, 370 A. 2d 554 (1977), this Court endorsed § 267 of Restatement (Second) of Agency, which provides in part:

> "One who represents that another is his servant or other agent and thereby causes a third person *justifiably to rely* upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such." (Emphasis supplied.)

*B. P. Oil Corp. v. Mabe, supra,* concerned a plaintiff who drove into a BP service station where an attendant apparently poured gasoline instead of water into the radiator, resulting in a fire which injured the plaintiff. No actual agency relationship between the operator of the station and B. P. Oil Corp. was found to have been established. Although a number of signs read "BP," and there were no signs indicating private ownership, this Court held that the circumstances in the case were not sufficient for the jury to infer that the plaintiff had justifiably relied on B. P. Oil Corp. to provide the desired *services.* Speaking for the majority of the Court, Judge Smith noted that it is commonly known that a substantial number of service stations are independently owned, and stated (279 Md. at 649):

> ". . . [The plaintiff] said he was attracted to Faison's station by '[n]othing except for the [fact that it was a] BP station, [and it] had BP signs, BP gas, BP pumps.' This, added to the statement of Mabe that his reason for choosing the station in question was that he 'always buy[s] BP gasoline, always deal[s] with BP,' is but little different from a statement that one always buys a particular make of shoes, wears clothes with a certain label,

drives an automobile produced by a certain manufacturer, eats a certain brand of breakfast cereal, or smokes a certain kind of cigarette."

The Hospital argues that the circumstances of the instant case are analogous. Although there were no signs or any other indications that the emergency room was not run by the Hospital staff, the Hospital contends that, as in *B. P. Oil Corp. v. Mabe, supra,* these appearances do not justify reliance.

We disagree. First, in *B. P. Oil Corp. v. Mabe, supra,* it was necessary to distinguish between the products offered for sale and the automotive services provided by the attendant. The mere fact that BP *products* are advertised for sale does not, in itself, justify the inference that BP is as well directly providing automotive *services*. The Hospital, however, is engaged in the business of providing health care services. One enters a hospital for no other reason. When Mr. Powell made the decision to go to Holy Cross Hospital, he obviously desired medical services and equally obviously was relying on Holy Cross Hospital to provide them. Furthermore, the Hospital and the emergency room are located in the same general structure. In this regard, it is as if a customer were to purchase automotive services on the premises of the BP refinery or on the premises where the corporate headquarters were located.

In the instant case, all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution. It is not to be expected, and nothing put Mr. Powell on notice, that the various procedures and departments of a complex, modern hospital like Holy Cross are in fact franchised out to various independent contractors. The situation seems to us substantially similar to that in *Stanhope v. Los Angeles College of Chiropractic,* 54 Cal.App.2d 141, 128 P. 2d 705 (1942), where the court, holding that an apparent agency

existed between a hospital and an independent radiologist, stated (128 P. 2d at 708):

"... [The] appellant did nothing to put respondent on notice that the X-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room ... should have inquired whether the individual doctors who examined him were employees ... or were independent contractors."

We thus hold that Holy Cross Hospital represented to the decedent that the staff of the Holy Cross Hospital emergency room were its employees, thereby causing the decedent to rely on the skill of the emergency room staff, and that the Hospital is consequently liable to the decedent as if the emergency room staff were its employees.

(2)

The emergency room physician, Dr. Cosca, had also moved for a directed verdict in the trial court. Dr. Cosca argues that the denial of this motion was error, contending that the plaintiffs had failed to establish that Dr. Cosca's negligence was a proximate cause of Mr. Powell's death.

It was conceded that Dr. Cosca failed to correctly interpret an electrocardiogram taken of the decedent in the Hospital emergency room on May 28, 1974. Dr. Cosca claims, however, that the subsequent failure of Dr. Mehlman to acquaint himself with the true clinical condition of the decedent, as well as the alleged failure of an employee of the Hospital to notify Dr. Cosca of a subsequent correct interpretation of the decedent's electrocardiogram, were intervening acts of negligence which interrupted the causal connection between Dr. Cosca's negligence and Mr. Powell's death.

The fallacy in Dr. Cosca's contention is that the subsequent negligence would constitute a defense only if it were a superseding cause of the decedent's injury. *State v.*

*Hecht Co.*, 165 Md. 415, 169 A. 311 (1933); *Conowingo Power Co. v. State of Maryland*, 120 F. 2d 870 (4th Cir. 1941); Prosser, *Law of Torts* § 44 (4th ed. 1971). Clearly, however, it was not a superseding cause. Dr. Cosca's failure to correctly interpret the decedent's electrocardiogram continued to be a proximate and efficient cause of the patient's death, despite the fact that it may have been subsequently accompanied by the negligent omissions of others. The negligence of a third party, which merely operates along with a defendant's negligence, presents an ordinary case of concurring negligence and does not affect the liability of the defendant. *Brawner v. Hooper*, 151 Md. 579, 135 A. 420 (1926).

Dr. Cosca further argues that the trial court erred in instructing the jury that there was no evidence of any independent negligence by the Hospital causing Mr. Powell's death and that the Hospital could only be held liable upon an agency theory. It is argued that this instruction may have prejudiced Dr. Cosca with regard to the Hospital's cross-claim for indemnity against him.

In contending that there was evidence of actionable negligence by the Hospital itself, Dr. Cosca relies on testimony to the effect that, under the Hospital's regulations, an emergency room physician did not have the right to admit patients to the Hospital and that only the patient's private physician was allowed to admit him. With regard to this regulation of Holy Cross Hospital, there was testimony by Dr. Rodman that:

> "It is wrong. It is unethical to tie [the emergency room physician's] hands and put him in a position where he cannot admit the patient. That is contrary to prevailing standards . . . . It is an egregious breach of prevailing medical standards."

Assuming, however, that the Hospital's regulation does constitute a breach of prevailing medical standards, in the instant case the record shows that the judgment to deny Mr.

Powell admission was based on Dr. Cosca's faulty diagnosis. That is, the evidence did not establish a causal connection between the regulation and Mr. Powell's death.

We are constrained, therefore, to agree with the trial court's conclusion that there was no evidence of any independent negligence on the part of Holy Cross Hospital which contributed to Mr. Powell's death.

(3)

The principal issue raised by Dr. Mehlman is an evidentiary question. Dr. Mehlman contends that the plaintiffs' expert witness, Dr. Rodman, should not have been allowed to express opinions concerning whether Dr. Mehlman had complied with the appropriate standards of care in his treatment of Mr. Powell, on the ground that no factual predicate for these opinions had been established.

At the beginning of his testimony, Dr. Rodman said that he had familiarized himself with Mr. Powell's history by reviewing various medical records, depositions and answers to interrogatories. While the medical records were introduced into evidence, only portions of the depositions and answers were introduced. Dr. Mehlman contends that Dr. Rodman's opinions may thus have been based on material not available to the jury and that, consequently, the jury had "no way of knowing the factual predicate on which he based his opinion."

It is well settled that an expert witness may not deliver his opinions in a factual vacuum. As this Court said in *State, Use of Solomon v. Fishel*, 228 Md. 189, 198, 179 A. 2d 349 (1962):

> "The jury must be informed of the facts or assumed facts upon which the expert's opinion is based and there must be evidence to support such facts, but it is for the jury to determine whether they exist or not and, if the jury's finding on controverted questions of fact is contra to the premise upon which the expert bases his opinion, his opinion falls with the premise."

*See,* in addition, *Greenstein v. Meister,* 279 Md. 275, 285, 368 A. 2d 451 (1977), and cases there cited. However, in our examination of the testimony in the instant case, we have found that all of the opinions offered by Dr. Rodman concerning Dr. Mehlman's violations of the applicable standard of care due Mr. Powell were accompanied by or prefaced with a full statement of the facts on which Dr. Rodman was relying, as well as the reasons why such facts were pertinent. All of these facts were supported by the material introduced into evidence.

It is not argued that there were in fact statements prejudicial to Dr. Mehlman in those portions of the interrogatories and depositions which were not introduced into evidence, which might have contributed to Dr. Rodman's opinions about Dr. Mehlman's treatment of Mr. Powell. Further, it cannot seriously be contended that the mere statement by Dr. Rodman that he had reviewed material not introduced into evidence would mislead the jury as to the factual predicate of his opinions. An examination of Dr. Rodman's testimony reveals that the jury was fully apprised of the factual basis for his opinions, and that this factual basis was supported by the evidence in the case. Therefore, we conclude that the trial judge properly allowed Dr. Rodman to give his opinion as to whether Dr. Mehlman's treatment of Mr. Powell complied with the prevailing standards of medical care.

*Judgments affirmed.*
*Appellants to pay costs.*