885 A.2d 802

Elie G. DEBBAS, et al.

v.

Thelma NELSON, et al.

No. 10, Sept. Term, 2005.

Court of Appeals of Maryland.

Nov. 9, 2005.

Robert W. Goodson (Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Washington, DC), Thomas L. Doran (Anne Marie McGinley, DeCaro, Doran, Siciliano, Gallagher & De-Blasis, LLP, Lanham), all on brief, for petitioners.

Ronald Simon (Simon & Associates, Washington, DC, Kenneth M. Trombly, Schultz & Trombly, PLLC, Washington, DC, on brief), for respondents.

George S. Tolley, III, Dugan, Babij & Tolley, LLC, Timonium, amicus curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

This case presents us with the task of determining whether a facially valid Certificate of Qualified Expert, a prerequisite to instituting a medical malpractice action, can be invalidated by subsequent developments, specifically the allegedly inconsistent deposition testimony of the certifying medical expert. We hold that the Health Care Malpractice Claims Act does not permit such collateral attacks based on events arising

after the Certificate has been filed. As such, Respondents' Certificate of Qualified Expert was not substantially defective, and the Circuit Court erroneously granted Petitioner Dr. Elie Debbas's motion to dismiss and Petitioner Fort Washington Hospital's motion for summary judgment on that basis.

We have also been asked to explore whether a genuine dispute of material fact exists regarding the vicarious liability of Petitioner Fort Washington Hospital. We find that a genuine dispute of material fact remains concerning whether the defendant physicians were agents of the Hospital for the purposes of vicarious liability. Therefore, we conclude that the Circuit Court erroneously granted the Hospital's motion for summary judgment.

We shall affirm the decision of the Court of Special Appeals.

### Facts

On May 10, 2000, Madeline V. Lyons went to the emergency room at Fort Washington Hospital complaining of weakness and fatigue. Dr. Hengameh N. Mesbahi examined her, ordered various blood tests, and diagnosed Ms. Lyons with mild anemia. He wrote her a prescription for iron supplements and advised her to follow up with her primary care physician, Dr. Michael Sidarous. Two days later, Ms. Lyons visited Dr. Sidarous and presented symptoms similar to those about which she had complained during her emergency room examination. Dr. Sidarous diagnosed Ms. Lyons with mild congestive heart failure, prescribed medication, and informed her that she should return to the Hospital if her symptoms worsened. In the early hours of May 16, 2000, Ms. Lyons awoke with acute burning abdominal pain and within several hours was admitted to the emergency room at the Hospital, where she was treated by Dr. Patrick W. Daly, Director of the Hospital's Emergency Medical Department, Dr. Sidarous, and Dr. Elie G. Debbas, Chief of Surgery at the Hospital and the then President of the Medical Staff. She died later that evening.

On April 8, 2002, Ms. Lyons's surviving five daughters (the "Respondents") filed a Statement of Claim against Dr. Debbas, Dr. Sidarous, and the Hospital with the Health Claims Arbitration Office ("HCAO"), pursuant to the Maryland Health Care Malpractice Claims Act ("the Act"), Md.Code (1974, 1998 Repl.Vol., 2000 Supp.), §§ 3–2A–01 to 3–2A–09 of the Courts and Judicial Proceedings Article. Accompanying the Statement of Claim was a Certificate of Qualified Expert, executed by Dr. Ann M. Gordon, attesting to alleged deviations from the proper standard of care committed by Dr. Sidarous, Dr. Debbas, and the Hospital. Respondents also simultaneously filed an Election to Waive Arbitration pursuant to Maryland Code (2002 Repl.Vol.), § 3–2A–06B of the Courts and Judicial Proceedings Article.[1] On April 30, 2002, Respondents filed their complaint in the Circuit Court for Prince George's County.

The defendant physicians and the Hospital deposed Dr. Gordon, the certifying physician, on November 8, 2002. The following discourse occurred among Dr. Gordon and counsel for Dr. Sidarous, Dr. Debbas, and the Hospital:

[COUNSEL FOR DR. SIDAROUS]: Based on your review of the materials, have you formed opinions that you hold with reasonable medical probability as to whether any health care provider defendant deviated from standard of care in their care and treatment of Madeline Lyons?

[DR. GORDON]: Yes, I do.

\* \* \*

[COUNSEL FOR DR. SIDAROUS]: I think I had asked you who you hold such opinions with regard to.

[DR. GORDON]: Dr. Sidarous.

---

1. Section 3–2A–06B of the Courts and Judicial Proceedings Article provides in pertinent part:

(b)(1) Subject to the time limitation under subsection (d) of this section, any claimant may waive arbitration at any time after filing the certificate of qualified expert required by § 3–2A–04(b) of this subtitle by filing with the Director a written election to waive arbitration signed by the claimant or the claimant's attorney of record in the arbitration proceeding.

[COUNSEL FOR DR. SIDAROUS]: Have you formed any opinions with regard to any other health care provider beyond him?

[DR. GORDON]: No.

* * *

[COUNSEL FOR DR. DEBBAS]: Dr. Gordon, I'll be very short. I represent Dr. Debbas, the surgeon in this case, and your counsel was kind enough to say at the outset of your deposition you don't intend to render any opinions regarding my client, Dr. Debbas, is that correct?

[DR. GORDON]: That's correct. I believe that there will be other medical experts who will be addressing those opinions and issues.

* * *

[COUNSEL FOR FORT WASHINGTON HOSPITAL]: Are you going to be rendering any opinions, Doctor, that Fort Washington Medical Center or its employees deviated from the standard of care?

[DR. GORDON]: I would probably defer that to the experts that the plaintiff attorneys have concerning the emergency room visit on 5/16 I believe.

[COUNSEL FOR THE HOSPITAL]: On 5/16?

[DR. GORDON]: Yes.

[COUNSEL FOR THE HOSPITAL]: Okay. So you will not be rendering any opinions then. You're going to defer to other experts?

[DR. GORDON]: That's correct.

The litigation proceeded on Respondents' First Amended Complaint, which was filed on November 22, 2002. On June 3, 2003, Dr. Debbas filed a motion to dismiss based on his assertion that the above-quoted colloquy invalidated Respondents' Certificate of Qualified Expert. On June 18, 2003, the Hospital filed a motion for summary judgment based upon the same argument posited by Dr. Debbas as well as the assertion that the record could not support a finding of negligence by

the Hospital.[2] Respondents filed an opposition to both motions and appended an affidavit by Dr. Gordon in which she reaffirmed the statements contained in her certification. On August 29, 2003, the Circuit Court granted the motion to dismiss and the motion for summary judgment on the basis that Respondents had failed to establish a *prima facie* showing of apparent authority. Respondents filed motions to reconsider or amend the judgments, all of which were denied by the Circuit Court on October 2, 2003 and then filed their notice of appeal to the Court of Special Appeals on October 27, 2003.

In a reported opinion, the Court of Special Appeals determined that Respondents' Certificate of Qualified Expert satisfied the Act's requirements and reversed the Circuit Court's dismissal of the complaint against Dr. Debbas. *Nelson v. Debbas*, 160 Md.App. 194, 208, 862 A.2d 1083, 1091 (2004). Moreover, the appellate court held that the record supported a finding that there existed a dispute of material fact relating to the apparent authority of the physicians with respect to the Hospital and the potential vicarious liability of the Hospital. In part, the Court of Special Appeals relied upon the language in the medical consent form that Ms. Lyons was required to sign prior to her admission to the emergency room, which provided in pertinent part:

> **MEDICAL CONSENT:** I hereby voluntarily consent to such diagnostic procedures and hospital care and to such therapeutic treatment by the doctors of the medical staff of Fort Washington Hospital, which in their judgment becomes necessary while I am an Emergency Department patient or an inpatient in said hospital.

---

2. Although Dr. Patrick Daly, M.D., head of the Emergency Department of the Hospital, and Dr. Mesbahi, Ms. Lyons's initial treating physician, were not named in the Certificate of Qualified Expert, Respondents, when amending their complaint, added Dr. Daly and Dr. Mesbahi as additional defendants. Dr. Daly and Dr. Mesbahi also filed motions to dismiss, which were granted by the Circuit Court. Respondents did not challenge those dismissals on appeal. Dr. Sidarous did not file a motion to dismiss or a motion for summary judgment.

The appellate court also relied on the facts that Dr. Debbas was the President of the Medical Staff and Chief of Surgery at the Hospital at the time of Ms. Lyons's admission, and that Dr. Daly was the Director of Emergency Medicine. Based on these facts, the intermediate appellate court determined that the evidence of record was sufficient to create a genuine dispute of material fact regarding the issue of apparent authority and vicarious liability. *Id.* at 213, 862 A.2d 1083, 862 A.2d at 1094.

On January 21 and 24, 2005, Dr. Debbas and the Hospital filed in this Court separate petitions for writs of certiorari. Dr. Debbas presented the following issue for our consideration:

1. Whether the Court of Special Appeals erred in reversing the trial court's decision to dismiss plaintiff's medical negligence suit on the grounds that an opinion given as part of a Certificate of a Certifying Expert that is subsequently disavowed during deposition testimony renders the Certificate invalid and therefore must be dismissed.

The Hospital presented two issues for our review:

1. Did the Court of Special Appeals err when it concluded that the Affidavit of Ann M. Gordon, M.D., was not substantially defective and complied with the Certificate of Qualified Expert requirements of the Maryland Health Care Malpractice Claims Act.

2. Did the Court of Special Appeals err when it concluded that there was sufficient evidence to create a dispute of material fact on the question of whether there was an agency relationship between the attending emergency room physicians, who administered care to Ms. Lyons, at the Hospital.

On April 7, 2005, we granted the petitions and issued the writs. *Debbas v. Nelson,* 386 Md. 180, 872 A.2d 46 (2005).

We hold that the Certificate of Qualified Expert filed by the Respondents was not defective due to events arising subsequent to its filing and that the Circuit Court erroneously granted Dr. Debbas's motion to dismiss and the Hospital's

motion for summary judgment on that basis. Moreover, we hold that sufficient facts exist in the record to create a genuine dispute of material fact concerning whether the physicians and surgeons involved in this matter were agents of the Hospital, thus rendering summary judgment improper. Therefore, we affirm the judgment of the Court of Special Appeals.

 In reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations. *Reichs Ford Road Joint Venture v. State Roads Commission of the State Highway Administration,* 388 Md. 500, 509, 880 A.2d 307, 312 (2005); *Adamson v. Correctional Medical Services,* 359 Md. 238, 246, 753 A.2d 501, 505 (2000); *Allied Inv. Corp. v. Jasen,* 354 Md. 547, 555, 731 A.2d 957, 961 (1999); *Stone v. Chicago Title Ins. Co. of Maryland,* 330 Md. 329, 333, 624 A.2d 496, 498 (1993). In the end, "[d]ismissal is proper only if the complaint would fail to provide the plaintiff with a judicial remedy." *Reichs Ford Road Joint Venture,* 388 Md. at 509, 880 A.2d at 312, citing *Bobo v. State,* 346 Md. 706, 709, 697 A.2d 1371, 1373 (1997). *See also Allied Inv. Corp.,* 354 Md. at 555, 731 A.2d at 961. In sum, because we must deem the facts to be true, our task is confined to determining whether the trial court was legally correct in its decision to dismiss. *See Allied Inv. Corp.,* 354 Md. at 555, 731 A.2d at 961; *Bobo,* 346 Md. at 709, 697 A.2d at 1373.

 With respect to the Hospital's motion for summary judgment, we must determine, initially, whether a dispute of material fact exists. Md. Rule 2–501(f) (2002); *Serio v. Baltimore County,* 384 Md. 373, 388, 863 A.2d 952, 961 (2004); *O'Connor v. Baltimore County,* 382 Md. 102, 110, 854 A.2d 1191, 1196 (2004); *Todd v. MTA,* 373 Md. 149, 154–55, 816 A.2d 930, 933 (2003); *Beyer v. Morgan State Univ.,* 369 Md. 335, 359, 800 A.2d 707, 721 (2002); *Schmerling v. Injured Workers' Ins. Fund,* 368 Md. 434, 443, 795 A.2d 715, 720 (2002); *see Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 209, 783 A.2d 194, 199 (2001); *Lippert v. Jung,* 366 Md. 221, 227,

783 A.2d 206, 209 (2001). " 'A material fact is a fact the resolution of which will somehow affect the outcome of the case.'" *Todd*, 373 Md. at 155, 816 A.2d at 933, quoting *Matthews v. Howell*, 359 Md. 152, 161, 753 A.2d 69, 73 (2000). The facts properly before the court as well as any reasonable inferences that may be drawn from them must be construed in the light most favorable to the non-moving party. *Serio*, 384 Md. at 388, 863 A.2d at 961; *O'Connor*, 382 Md. at 111, 854 A.2d at 1196; *Todd*, 373 Md. at 155, 816 A.2d at 933; *Okwa v. Harper*, 360 Md. 161, 178, 757 A.2d 118, 127 (2000). If the record reveals that a material fact is in dispute, summary judgment is not appropriate. *Serio*, 384 Md. at 388, 863 A.2d at 961; *O'Connor*, 382 Md. at 111, 854 A.2d at 1196; *Todd*, 373 Md. at 155, 816 A.2d at 933; *Okwa*, 360 Md. at 178, 757 A.2d at 127. If no material facts are disputed, however, then we must determine whether the circuit court correctly granted summary judgment as a matter of law. *See* Md. Rule 2–501(f); *Serio*, 384 Md. at 388, 863 A.2d at 961; *O'Connor*, 382 Md. at 111, 854 A.2d at 1197; *Todd*, 373 Md. at 155, 816 A.2d at 933; *Beyer*, 369 Md. at 360, 800 A.2d at 721; *Schmerling*, 368 Md. at 443, 795 A.2d at 720.

### Discussion

Dr. Debbas and the Hospital argue that when Dr. Gordon, in her deposition, did not offer opinions with respect to alleged deviations from the standard of care committed by Dr. Debbas and the staff of the Hospital, she rescinded the opinions that she had expressed in the Certificate of Qualified Expert filed by Respondents, thereby rendering the Certificate invalid. According to Dr. Debbas and the Hospital, the Court of Special Appeals's holding that the Certificate was still effective significantly diminishes the Certificate's role in preventing specious claims from consuming limited judicial resources. Moreover, Dr. Debbas and the Hospital contend that the Court of Special Appeals erred in finding that a deficient Certificate may be remedied with an affidavit from the certifying expert after the statutory deadline for filing a Certificate has lapsed. They note that the Maryland Health Care Mal-

practice Claims Act does not permit such a remedy and thus, it is improper.

The Hospital also argues that the Court of Special Appeals erred in ruling that there was a dispute of material fact with respect to Respondents' allegations of apparent agency. Specifically, the Hospital contends that the record lacks any evidence concerning Respondents' claim that the Hospital represented that the physicians were its agents and that Ms. Lyons relied on those representations. It asserts that Respondents failed to establish a *prima facie* case of agency and therefore their theory of liability must fail.

Conversely, Respondents contend that the holding of the Court of Special Appeals is consistent with the legislative intent of the Maryland Health Care Malpractice Claims Act because the Certificate of Qualified Expert was valid at the time it was filed and at all subsequent times. Moreover, Respondents assert that the affidavit submitted by Dr. Gordon after the deposition was properly considered by the Court of Special Appeals because Dr. Gordon never explicitly recanted her certifying opinion.

Respondents also argue that the Court of Special Appeals was correct in determining that there was sufficient evidence to present a genuine dispute of material fact on the issue of the potential vicarious liability of the Hospital including the language of the consent form signed by Ms. Lyons and Dr. Debbas's title as President of the Medical Staff and Chief of Surgery at the Hospital. Furthermore, according to Respondents, the dismissal of Dr. Daly, on grounds unrelated to the question of his negligence, does not preclude Respondents from relying on the theory of apparent agency in holding the Hospital liable under a theory of *respondeat superior.* Even if the dismissal of Dr. Daly could preclude a claim against the Hospital based upon his negligence, Respondents assert that the Hospital could still be found to be vicariously liable due to Dr. Debbas's deviation from the applicable standard of care and the theory of Dr. Debbas's apparent agency.

## The History of the Health Claims Arbitration Act

In the 1970's, medical malpractice insurers faced "a dramatic increase in the number of malpractice suits being filed and an alarming rise in the dollar amounts of malpractice verdicts." James Kevin MacAlister and Alfred L. Scanlan, Jr., *Health Claims Arbitration in Maryland: The Experiment has Failed*, 14 U. BALT. L.REV. 481, 488 (1985). The proliferation of litigation was the result of several complex social factors, including the "erosion of the traditional doctor-patient bond," the increasing use of specialists for care as opposed to general practitioners, and the increasing litigious nature of society. *Id.*

Medical malpractice insurers initially responded to the dramatic rise in litigation by raising premium rates for physicians. When rate increases were no longer sufficient to offset the increased costs associated with defending malpractice suits, carriers began to cease underwriting medical malpractice insurance in Maryland. *See St. Paul Fire & Marine Ins. Co. v. Insurance Commissioner*, 275 Md. 130, 339 A.2d 291 (1975).

In 1975, St. Paul Fire & Marine Insurance Company ("St. Paul"), then Maryland's largest malpractice insurance carrier, informed the State Insurance Commissioner that it intended to withdraw from the medical malpractice insurance market because it no longer considered it profitable. *St. Paul Fire & Marine Ins. Co. v. Insurance Commissioner*, 275 Md. 130, 134, 339 A.2d 291, 294 (1975). The State Insurance Commissioner issued an order proscribing St. Paul's withdrawal and requiring it to continue to provide insurance coverage. *Id.* at 135, 339 A.2d at 294. The Baltimore City Court affirmed the Insurance Commissioner's order. *Id.* This Court reversed, stating that the Insurance Commissioner could not require St. Paul to provide medical malpractice insurance, *id.* at 144, 339 A.2d at 299, and issued an immediate order. *Id.* at 132, 339 A.2d at 292.

The General Assembly responded by forming a committee to study the methods of reforming the legal process of pursu-

ing claims of medical malpractice. The Medical Malpractice Insurance Study Committee was appointed on July 23, 1975, and on January 6, 1976, issued its report. Report of the Medical Malpractice Insurance Study Committee (January, 1976).

The Committee proposed the adoption of a mandatory medical malpractice arbitration system, which, it asserted, would improve traditional tort litigation by discouraging the pursuit of non-meritorious claims because, through the arbitration process, weaknesses in such a case would be revealed. *Id.* at 3–8. Moreover, the Committee opined that mandatory arbitration would provide a means for "obtaining expert opinion on the question of negligence," which would lead to more reliable decisions as well as reasonable and predictable awards. *Id.* at 4 & 8. The Committee appended proposed legislation to the report, which was enacted by the General Assembly without substantive change as 1976 Md. Laws, Chap. 235 and codified as Maryland Code (1974, 1977 Supp.), §§ 3–2A–01 *et seq.* of the Courts and Judicial Proceedings Article.

Mandatory arbitration became the rule; its process was described by Judge Robert L. Karwacki, writing for this Court, as follows:

> All malpractice claims against health care providers seeking damages of more than $5,000 are subject to the provisions of the Act, and must be initially filed, as must the responses to them, with the Health Claims Arbitration Office, created by the statute "as a unit in the Executive Department." The office, acting through its director, refers all issues raised to a three-member arbitration panel, chosen at random from lists of qualified persons prepared and maintained by the director; the panel for each claim is to be composed of an attorney, a health care provider, and a member of the general public. The arbitration panel determines whether the health care provider is liable to the claimant and if so the extent of the damages, and incorporates in its award an assessment of costs, including arbitrators' fees; if no party rejects the award, it becomes final and binding, is filed by the director with the appropriate circuit court, and when

confirmed by that court constitutes a final judgment. Neither party, however, is in any way bound to accept the award; it may be rejected for any reason within ninety days. If a party desires to contest the decision of the panel, he must file an action in the appropriate court during the ninety-day period to nullify the award, and jury trial may be elected by either party. Any contention that an award should be vacated on the grounds of corruption, fraud, partiality or the like is to be decided by the court prior to trial. Unless the award is thus vacated, it is admissible as evidence at the trial and presumed to be correct, with the burden of proving the contrary falling on the party rejecting it; should the award be vacated, "trial of the case shall proceed as if there had been no award." In addition, attorneys' fees are subjected to the approval respectively of the arbitration panel and the court.

*Carrion v. Linzey*, 342 Md. 266, 276–77, 675 A.2d 527, 531–32 (1996), quoting *Attorney General v. Johnson*, 282 Md. 274, 279–80, 385 A.2d 57, 60–61 (1978).

The imposition of arbitration as a condition precedent to instituting suit in Circuit Court, nevertheless, did little to resolve the crisis. In 1983, the General Assembly adopted a Senate Joint Resolution, 1983 Md. Laws, J. Res. 9, declaring that the cost of medical liability insurance had increased tenfold since 1975 and requested that the Governor appoint a commission to examine the issue. *Witte v. Azarian*, 369 Md. 518, 528, 801 A.2d 160, 166 (2002).

The Commission on Health Care Providers' Professional Liability Insurance, which was appointed pursuant to the Joint Resolution, as stated in its 1984 Report to the Governor, developed several recommendations, including (1) abolition of the arbitration scheme created in 1976, (2) partial abolition of the collateral source rule,[3] (3) a number of procedural changes

---

**3.** The collateral source rule permits an injured person to recover the full amount of his or her provable damages, "regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Haischer v. CSX Transp., Inc.*, 381

designed to streamline the arbitration procedure and allow parties to waive arbitration completely if it were not abolished, and (4) a requirement that a malpractice claimant file a certificate of a qualified expert within ninety days after the filing of a claim attesting to a departure from the standard of care or of informed consent, as some other jurisdictions had enacted.

Some of the Commission's recommendations, including the requirement that a claim be dismissed if the claimant failed to file a certificate from a qualified expert attesting to a departure from the standards of care within ninety days from the date that the claim was filed with the Health Care Arbitration Office, were presented to the 1984 session of the General Assembly as Senate Bill 16. The Bill, however, did not pass, which resulted in the formation of another study group, the Joint Executive/Legislative Task Force on Medical Malpractice Insurance. *Witte,* 369 Md. at 529, 801 A.2d at 166.

The Task Force, in its December 1985 Report, noted that, since 1984, there had been increases ranging from 30% to 250% in medical malpractice liability insurance premiums for physicians in certain specialties. Unlike the 1984 Commission, however, the Task Force did not address whether the arbitration process should be abolished, but rather, presented a number of recommendations similar to those made by the Commission to make the process more efficient. The Task Force reintroduced the requirement of a Certificate of Qualified Expert, to be filed by both the claimant and the defendant, which was intended to eliminate excessive damages and reduce the frequency of claims, and which consistently has been considered as serving a gatekeeping function. Report of the Joint Executive/Legislative Task Force in Medical Malpractice Insurance, at 27 & 30 (Dec.1985). *See Carrion,* 342 Md. at 275, 675 A.2d at 531 (noting that the elements of the arbitration system, including the Certificate, acted to "discourage litigation of non-meritorious claims"); *Edward W.*

---

Md. 119, 132, 848 A.2d 620, 628–29 (2004), quoting *Motor Vehicle Admin. v. Seidel,* 326 Md. 237, 253, 604 A.2d 473, 481 (1992).

*McCready Memorial Hospital v. Hauser*, 330 Md. 497, 512, 624 A.2d 1249, 1256–57 (1993) (stating that the Certificate is a central step in discouraging litigation of meritless claims through arbitration).

The Certificate requirement was presented to the General Assembly in Senate Bill 559. In pertinent part, Senate Bill 559 provided that a claim filed after July 1, 1986, would be dismissed if, within ninety days after the date that the claim was filed, the claimant did not file a Certificate of Qualified Expert attesting to a departure from the standard of care with the Health Claims Arbitration Office. 1986 Md. Laws, Chap. 640. Senate Bill 559, enacted as 1986 Maryland Law, chapter 640, was codified as Maryland Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.), Section 3–2A–04 of the Courts and Judicial Proceedings Article, which provides in pertinent part:

(b) *Filing and service of certificate of qualified expert.—* Unless the sole issue in the claim is lack of informed consent:

(1)(i) Except as provided in subparagraph (ii) of this paragraph, a claim filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant fails to file a certificate of a qualified expert with the Director attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint. The claimant shall serve a copy of the certificate on all other parties to the claim or their attorneys of record in accordance with the Maryland Rules.

\*　　\*　　\*

(4) The attesting expert may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims. Md.Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.), § 3–2A–04(b)(1) and (4) of the Courts and Judicial Proceedings Article.

During the Legislature's 1995 session, the General Assembly enacted another major change in the Health Claims Arbitration Act by permitting waiver of the entire arbitration

process by either party. 1995 Md. Laws, Chap. 582, codified as Md.Code (1974, 2002 Repl.Vol.), § 3–2A–06B of the Courts and Judicial Proceedings Article.

With this history in mind, we turn to the case *sub judice.*

### Certificate of Qualified Expert

██ Petitioner Debbas, in his motion to dismiss, and the Hospital, in its motion for summary judgment, challenge the adequacy of Respondents' Certificate of Qualified Expert.[4] Specifically, Petitioners assert that Respondents' expert recanted her opinions regarding the negligence of Dr. Debbas and the staff of the Hospital during her deposition testimony in preparation for trial. To determine whether Respondents' Certificate of Qualified Expert is subject to invalidation by subsequent events, we must first examine the applicable provisions of the Health Care Malpractice Claims Act.

Section 3–2A–04 of the Courts and Judicial Proceedings Article provides in pertinent part:

(b)(1)(i) Except as provided in subparagraph (ii) of this paragraph, a claim or action filed after July 1, 1986, shall be dismissed, without prejudice, if the claimant fails to file a certificate of qualified expert with the Director [of the Health Care Arbitration Office] attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint.

\* \* \*

(3) Discovery is available as to the basis of the certificate.

Md.Code (1974, 1998 Repl.Vol., 2000 Supp.), §§ 3–2A–04 (b)(1)(i) and (3) of the Courts and Judicial Proceedings Article.

---

4. In their briefs, Petitioners also raise Respondents' alleged failure to file a report with the Health Claims Arbitration Office in accordance with Section 3–2A–04 (b)(3) as appropriate grounds for the Circuit Court's dismissal and grant of summary judgment, but did not raise the issue in their petitions for writs of certiorari. Accordingly, the issue is not before us. *See* Md. Rule 8–131(b).

When attempting to ascertain the meaning of a statute, "we first look to the normal, plain meaning of the language.... If that language is clear and unambiguous, we need not look beyond the provision's terms...." *Bienkowski v. Brooks,* 386 Md. 516, 536, 873 A.2d 1122, 1134 (2005); *Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 81 (2004). "Moreover, when the meaning of a word or phrase in a constitutional or statutory provision is perfectly clear, this Court has consistently refused to give that word or phrase a different meaning on such theories that a different meaning would make the provision more workable, or more consistent with a litigant's view of good public policy, or more in tune with modern times, or that the framers of the provision did not actually mean what they wrote." *Bienkowski,* 386 Md. at 537, 873 A.2d at 1134.

The statutory language of Section 3–2A–04(b) explicates the requirements for a valid Certificate of Qualified Expert; it must be filed within ninety days after the claim is submitted to the Health Care Arbitration Office and "attest[ ] to [the] departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury." Md.Code, (1974, 1998 Repl.Vol., 2000 Supp.), § 3–2A–04 (b)(1)(i) of the Courts and Judicial Proceedings Article. The statute also provides that the certifying expert may not devote more than 20% of his or her professional activities to "activities that directly involve testimony in personal injury claims." *Id.* at § 3–2A–04 (b)(4).

In the present case, Respondents' Certificate of Qualified Expert states:

I, Ann M. Gordon, M.D., hereby certify as follows:

I am a practicing physician, board certified in Internal Medicine.

I have reviewed the medical records of Madeline V. Lyons.

From my review of the records it is my opinion that Michael G. Sidarous, M.D., Elie G. Debbas, M.D., and the staff at Fort Washington Hospital deviated from applicable stan-

dards of medical care in connection with their care and treatment of Madeline V. Lyons.

It is my further opinion that the deviations from the standard of care were the proximate cause of the death of Madeline V. Lyons.

I do not annually devote more than 20% of my professional work to activities that involve testimony in personal injury claims.

I have read the above and certify that it is true and correct to the best of my knowledge, information and belief.

The parties concede that the Certificate was timely filed and do not dispute that Dr. Gordon is qualified to render an opinion regarding Petitioners' conduct under the terms of Section 3–2A–04. Moreover, in the Certificate, Dr. Gordon attested specifically to the named defendants' deviations from the applicable standard of medical care and opined that such deviations were the proximate cause for Ms. Lyons's demise. No one suggests that Respondents did not file a valid Certificate of Qualified Expert based upon the above.

Petitioners argue that Section 3–2A–04(b)(3) provides for discovery with respect to the "basis of the certificate," and therefore, a collateral attack based on events subsequent to the Certificate's filing is appropriate. Essentially, Petitioners are arguing that the General Assembly intended "discovery" to invalidate an otherwise facially valid certificate. Of course, if the General Assembly had intended discovery or any subsequent event to be used as a mechanism to invalidate an otherwise valid Certificate, it could have so stated and converted the recognized gatekeeping function of the Certificate to a penultimate bar to litigation. *See Carrion*, 342 Md. at 275, 675 A.2d at 531 (noting that the elements of the arbitration system acted to "discourage litigation of non-meritorious claims"); *McCready*, 330 Md. at 512, 624 A.2d at 1257 (1993) (stating that the Certificate is an indispensable step in discouraging litigation of meritless claims through arbitration).

The plain language of the statute does not comport with Petitioners' arguments. To go beyond the plain language

would mean that when a simultaneous waiver of arbitration is filed, the original Certificate would bind the plaintiff to the use and judgment of the original expert. Any subsequent information, including that gleaned through interrogatories and requests for production of documents or through testimony in other depositions or in court proceedings, would likewise be binding upon the claimant. According to Petitioners, if the subsequent information was in any way inconsistent with the Certificate filed many months, if not years, before, it would render the Certificate invalid, barring the plaintiff from seeking any redress. Such a result does not conform with the plain language of the statute.

The time period delineated in Section 3–2A–04(b) also indicates that the Certificate of Qualified Expert Requirement was not intended to be subject to this kind of collateral attack. The Section requires that the Certificate be filed within 90 days of the date of the complaint, with extensions available upon a showing of good cause. Md.Code (1974, 1998 Repl. Vol., 2000 Supp.), § 3–2A–04 (b)(1)(i) of the Courts and Judicial Proceedings Article. Although this provides sufficient time to obtain medical records and possibly obtain deposition testimony from the parties, it is certainly not adequate for the claimant to fully prepare his or her case on the merits. The strictly limited time period provided for securing a valid Certificate of Qualified Expert demonstrates the General Assembly's intention that the findings and opinions contained therein would be preliminary. To interpret the statute otherwise might effectively preclude many malpractice suits from ever proceeding on the merits.

Our conclusion is consistent with the jurisprudence of this Court in *Witte v. Azarian*, 369 Md. 518, 801 A.2d 160 (2002), and the Court of Special Appeals in *D'Angelo v. St. Agnes Healthcare, Inc.*, 157 Md.App. 631, 853 A.2d 813 (2004). In *Witte*, the petitioner, Dr. Jeffrey Witte, challenged the validity of the plaintiff's Certificate of Qualified Expert based on the certifying expert's deposition testimony that approximately 60% of his patients were referred from either attorneys or workers' compensation insurance carriers. *Id.* at 523, 801

A.2d at 163. Dr. Witte's challenge, although ultimately unsuccessful, was permissible because it was based upon a statutory prerequisite for a valid certificate and only examined the circumstances in existence at the time of the Certificate's filing.

The factual scenario in *D'Angelo*, is similarly distinguishable from the case at bar. In *D'Angelo*, the petitioner filed two Certificates of Qualified Experts that failed to individually name the defendant physicians in their opinions concerning the deviations from the applicable standards of care and that such deviations were the proximate causes of the injuries at issue. *Id.* at 635, 853 A.2d at 816. As in *Witte*, the defendant physicians and hospital challenged the validity of the Certificate based on its failure to comply with the terms of the statute when it was filed. *Id.* at 635–36, 853 A.2d 813, 853 A.2d at 816.

Were we to reach the opposite conclusion, an otherwise valid Certificate of Qualified Expert would be rendered invalid if the certifying expert at some later date became a professional witness or even died. Such a harsh result would be inconsistent with the intent of the General Assembly.[5]

## Apparent Authority

In its motion for summary judgment, the Hospital also asserts that Respondents lacked sufficient evidence to create a question of material fact regarding the agency relationship between the defendant physicians and the Hospital. The Hospital contends that the physicians were independent contractors and that no agency relationship exists. The Circuit Court, in orally granting the Hospital's motion for summary judgment, stated that there was "insufficient evidence to

---

5. Because it is clear from the language of Section 3–2A–04 that a collateral attack based on subsequent events is not permitted, we need not reach the Court of Special Appeals's application of the "sham affidavit" doctrine as stated in *Pittman v. Atlantic Realty Co.*, 359 Md. 513, 529, 754 A.2d 1030, 1038 (2000), because we do not consider Dr. Gordon's subsequent affidavit.

support a continuation of the case on the basis of apparent authority." We disagree.

In the context of medical malpractice litigation, we have endorsed the apparent authority theory of agency as stated in the Restatement (Second) of Agency Section 267, which provides in pertinent part:

One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*See Mehlman v. Powell,* 281 Md. 269, 273, 378 A.2d 1121, 1123 (1977), quoting *B.P. Oil Corp. v. Mabe,* 279 Md. 632, 643, 370 A.2d 554, 560 (1977).

In *Mehlman v. Powell,* a case analogous to the case *sub judice,* the plaintiff visited a hospital emergency room for medical treatment. The plaintiff had no knowledge that the emergency department of the hospital was not operated by the hospital, but rather by an independent contractor. An emergency room physician, Dr. Cosca, ordered an electrocardiogram, a physical examination, x-rays, and other various tests, and subsequently made an initial diagnosis of pneumonitis. At trial, it was undisputed that the electrocardiogram revealed severe abnormalities, that Dr. Cosca's reading of it was erroneous, and that this misreading contributed to the plaintiff's demise. *Mehlman,* 281 Md. at 271, 378 A.2d at 1122.

Judge Eldridge, writing for this Court, explicated why the Court rejected the hospital's argument that it could not be vicariously liable for the actions of an independent contracting physician's negligence:

[A] [h]ospital ... is engaged in the business of providing health care services. One enters the hospital for no other reason. When [the plaintiff] made the decision to go to [the hospital], he obviously desired medical services and equally obviously was relying on [the hospital] to provide them. Furthermore, the [h]ospital and the emergency room are

located in the same general structure.... It is not to be expected, and nothing put [the plaintiff] on notice, that the various procedures and department of a complex, modern hospital ... are in fact franchised out to various independent contractors.

*Id.* at 274, 378 A.2d at 1124. Ultimately, we held that the hospital was liable for the physician's negligence because it had represented that the staff in the emergency room were its employees, and that the representation caused the decedent to rely on the staff's skill. *Id.* at 275, 378 A.2d at 1124.

In the case *sub judice,* as a prerequisite to admission into the Hospital's emergency room, Ms. Lyons was required to sign a consent form containing the following language:

**MEDICAL CONSENT:** I hereby voluntarily consent to such diagnostic procedures and hospital care and to such therapeutic treatment by doctors of the staff of Fort Washington Hospital, which, in their judgment becomes necessary while I am an Emergency Department patient or an inpatient in said hospital.

The language clearly states that the doctors practicing in the Hospital are Hospital staff. Moreover, the record indicates that at the time of the events at issue in the case at bar, Dr. Debbas was the President of the Medical Staff and Chief of Surgery at the Hospital. This fact, when considered in conjunction with the language of the medical consent form and our determination in *Mehlman,* creates a genuine dispute of material fact with respect to the relationship between the defendant physicians and the Hospital as well as Ms. Lyons's reliance thereon. Therefore, we agree with the Court of Special Appeals's determination that the Circuit Court improperly granted summary judgment in favor of Fort Washington Hospital.

### Conclusion

Because we determine that Respondents' Certificate of Qualified Expert is valid and that there was sufficient evidence of record to create a genuine issue of material fact on the

issue of apparent authority and vicarious liability, we shall affirm the Court of Special Appeals's decision to reverse both the Circuit Court's dismissal of Respondents' claim against Dr. Debbas and vacate its grant of summary judgment in favor of Fort Washington Hospital.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.*